NOTICE
Decision filed 09/03/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 250385-U

NO. 5-25-0385

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* ZA'MEIRA D., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macon County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 22-JA-42 |
| | ) | |
| Tahshaydia D., | ) | Honorable |
| | ) | Phoebe S. Bowers, |
| Respondent-Appellant). | ) | Judge, presiding. |

PRESIDING JUSTICE McHANEY delivered the judgment of the court.
Justices Cates and Vaughan concurred in the judgment.

**ORDER**

¶ 1   *Held*:   This court affirms the judgment of the circuit court where neither the finding of parental unfitness nor the determination that it was in the best interest of the minor to terminate parental rights was against the manifest weight of the evidence.

¶ 2   The respondent, Tahshaydia D. (Tahshaydia), appeals from the circuit court's judgment finding her an unfit parent for her minor daughter, Za'Meira D. (Za'Meira), and subsequently terminating her parental rights. Tahshaydia argues that the circuit court's unfitness finding and best-interest determination are both against the manifest weight of the evidence. For the following reasons, we affirm.

1

¶ 3                              I. BACKGROUND

¶ 4      Za'Meira was born on August 30, 2016. She lived with her mother, Tahshaydia, in Decatur. Za'Meira's natural father is Jacob E., who was not involved in his daughter's life.[1] According to a report submitted by CASA, a special advocate appointed by the circuit court, Tahshaydia was "a high suicide risk" whose "most recent suicide attempt" was on February 13, 2022. On March 4, 2022, the Department of Children and Family Services (DCFS) took Za'Meira into protective custody.

¶ 5      On March 8, 2022, when Za'Meira was five years old, the State filed a petition for adjudication of wardship, pursuant to section 2-13 of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-13 (West 2022)). The petition alleged that Za'Meira was (1) neglected due to an environment injurious to her welfare (*id.* § 2-3(1)(b)) in that Tahshaydia had untreated mental problems, and (2) abused due to a substantial risk of physical injury by other than accidental means (*id.* § 2-3(2)(ii)). That same day, the circuit court held a temporary custody hearing, after which it found probable cause to believe that Za'Meira was neglected or abused based on Tahshaydia's "ongoing mental health issues that are not under control." The court awarded temporary custody to DCFS and ordered supervised visitation.

¶ 6      On May 27, 2022, the circuit court held an adjudicatory hearing. Tahshaydia was present with appointed counsel. Following the hearing, the court found that Za'Meira had been neglected; the allegation of abuse was dismissed. In a written adjudicatory order entered on May 31, 2022, the court specified that Za'Meira had been neglected in that her environment was injurious to her welfare due to Tahshaydia's "ongoing mental health issues."

---

[1]Jacob E. is not a party to this appeal.

¶ 7    On September 27, 2022, the circuit court held a dispositional hearing. Tahshaydia was present with counsel. The court found that Tahshaydia was unfit to parent Za'Meira due to "ongoing untreated mental health issues." The court entered a dispositional order determining that it was in the best interests of Za'Meira that she be adjudged a ward of the court.

¶ 8    A series of permanency hearings were held between March 2023 and December 2024. No transcripts of these hearings are included in the record. After each permanency hearing, the circuit court entered a permanency order that continually found that Tahshaydia had failed to make reasonable and substantial progress toward returning Za'Meira home. Return home remained the permanency goal.

¶ 9    In December 2023, the State filed a motion to have Tahshaydia found unfit to parent Za'Meira and to terminate her parental rights. In February 2024, the circuit court conducted a fitness hearing and found that the State had failed to prove Tahshaydia unfit.

¶ 10    On December 2, 2024, the State filed a second motion to have Tahshaydia found unfit and to terminate her parental rights. The motion alleged that Tahshaydia was unfit because she had (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to Za'Meira's welfare (750 ILCS 50/1(D)(b) (West 2022)); (2) failed to make reasonable efforts to correct the conditions that were the basis for the removal of Za'Meira from the parent during any nine-month period following the adjudication of neglect (*id.* § 1(D)(m)(i)); and (3) failed to make reasonable progress toward the return of Za'Meira during the nine-month period between February 28, 2024, and November 28, 2024 (*id.* § 1(D)(m)(ii)). The State also alleged that it was in the best interest of Za'Meira that Tahshaydia's parental rights be terminated.

¶ 11    On February 27, 2025, the circuit court conducted a fitness hearing. Tahshaydia was not present. Her appointed attorney, who was present, represented to the court that he had not been in

3

contact with Tahshaydia. A single witness, Katie Brown (Brown), testified that she had worked as a child welfare specialist for DCFS since September 2021 and had been Za'Meira's caseworker since March 11, 2022, when this case began. She sent notice of the fitness hearing to Tahshaydia's home and telephoned Tahshaydia on the day of the fitness hearing, but her call was blocked. The "primary services" recommended for Tahshaydia were parenting, mental health, and domestic violence. Substance abuse was also recommended, but due to "a mishap" on Brown's part, it was not officially added until March 2024. Substance abuse was discussed with Tahshaydia at every child and family team meeting "from the very beginning of this case."

¶ 12    Brown testified that in January 2023, Tahshaydia was arrested for driving under the influence of alcohol (DUI). Tahshaydia completed a DUI assessment in March or April of 2023, which rated her "high risk" and indicated that she needed to complete 75 hours of substance abuse services. In November 2023, Tahshaydia completed another DUI assessment at another provider, Heritage Behavioral Health Center (Heritage). In January 2024, she set up a treatment plan at Heritage. However, because neither Tahshaydia nor Heritage contacted Brown about Tahshaydia's start or completion of any substance abuse services, Brown had no confirmation that Tahshaydia had ever engaged in those substance abuse services. In November 2024, at the child and family team meeting, Brown spoke with Tahshaydia about substance abuse services. Tahshaydia said that the judge who was handling her criminal case was going to allow her to complete such services online. Brown never received confirmation that Tahshaydia started or completed those services. Brown said the most recent Judici entry in Tahshaydia's DUI case was on January 8, 2025, which indicated that Tahshaydia admitted to the allegations in the third petition to revoke her supervision. Her supervision was terminated as unsuccessful, and a judgment of conviction was entered.

4

¶ 13    Tahshaydia failed to appear for 24 drug screens from September 2024 through January 2025, all of which were scheduled on days that Tahshaydia was not working. Brown testified, "She always had an excuse, that she did not either get the text message, she was on her period, she was sleeping, she was—she had too many appointments that day, she couldn't make it." On January 17, 2025, Brown went to Tahshaydia's house to conduct an oral drug screen, which was the only drug screen Tahshaydia ever completed, and it was negative.

¶ 14    Brown testified that Tahshaydia had completed her domestic violence services at a provider called Dove. On June 26, 2024, Tahshaydia arrived at the DCFS office for her child and family team meeting, and her two front teeth were "pushed back," causing her to have difficulty speaking. Tahshaydia explained that she "fell over her cat and hit her mouth on the stairs and had nerve damage." During that meeting, Tahshaydia said she was "in a relationship" with a female.

¶ 15    DCFS was provided with a police report, indicating that Tahshaydia had gone to the emergency room (ER), where she told a nurse that she had fallen over her cat. However, she later admitted to an officer that her boyfriend had punched her and thrown her down the stairs. After the ER visit, when police contacted Tahshaydia about the incident, she denied that a battery had been committed and refused to cooperate.

¶ 16    Brown testified that in late July 2024, she received an email from the state's attorney's office, informing her that Tahshaydia had been involved in another domestic abuse incident on July 24, 2024, with the same man who was involved in the June 2024 incident. The state's attorney's victim advocate was listening to telephone calls at the jail and found that Tahshaydia was having frequent telephone contact with her abuser. During one recorded conversation. Tahshaydia said that she was afraid that Brown would find out about the incident.

¶ 17    At the child and family team meeting in August 2024, Tahshaydia "denie[d] everything" concerning domestic abuse and said that she did not want to pursue charges. Because Tahshaydia had been involved in two domestic violence incidents within approximately one month, DCFS recommended that she "reengage in domestic violence services." When Brown and Tahshaydia discussed new domestic violence services, Tahshaydia said she was not going back to Dove. Brown asked whether she would go to another provider, Prime for Life. "[Tahshaydia] said she's not doing any more services," and refused to sign a release, without which Brown could not make a referral.

¶ 18    One of Brown's "major concerns" stemmed from a September 2024 supervised visit, during which Tahshaydia allowed Za'Meira to speak, over the phone, with Tahshaydia's abuser. According to Brown, the only reason the visit supervisor permitted the phone call was his belief that Jacob E. (Za'Meira's father) was the other party.

¶ 19    Brown testified that Tahshaydia had been engaged in mental health counseling "off and on" since August 2023. According to Tahshaydia's new therapist at Heritage, Tahshaydia's current goals were to build rapport with her new therapist and to discuss how her involvement with DCFS had affected her thought processes. The therapist wrote that "better appointment attendance could help [Tahshaydia] engage more and work toward the goal." Tahshaydia's current diagnosis was posttraumatic stress disorder, and her last counseling session was in early January 2025.

¶ 20    Brown testified that Tahshaydia had completed all of her parenting services. Tahshaydia's monthly supervised visits with Za'Meira had improved and were "going well." Brown testified that between March 2024 and December 2024, Tahshaydia was rated "unsatisfactory" in her service plan. Therefore, DCFS would not be able to return Za'Meira home in the reasonably near future.

6

¶ 21　At the conclusion of the testimony, after hearing final arguments, the circuit court found that the State had proven, by clear and convincing evidence, that Tahshaydia (1) had failed to maintain a reasonable degree of interest, concern, or responsibility as to Za'Meira's welfare; (2) had failed to make reasonable efforts to correct the conditions that were the basis for the removal of Za'Meira from the parent; and (3) had failed to make reasonable progress toward the return of Za'Meira during the nine-month period from February 28, 2024, to November 28, 2024. According to the court, during that period, Tahshaydia had substance-abuse services to engage in, and domestic-violence services to reengage in, but she failed to do so, and she told the caseworker that she was not going to engage in any more services. The court noted that Tahshaydia was the victim in two domestic-violence incidents, and she allowed Za'Meira to speak with Tahshaydia's abuser over the phone during a supervised visit. The court noted Tahshaydia's absence at the fitness hearing. The court found that Tahshaydia was unfit and scheduled a best-interest hearing.

¶ 22　On April 30, 2025, the court held a best-interest hearing. Tahshaydia was present with counsel. The State called Tiffanie Sisk (Sisk), who testified that she was a supervisor for the "placement team" at DCFS's Decatur field office and had supervised Za'Meira's case. According to Sisk, after the case was opened, Za'Meira was placed in traditional foster care, where she remained for a year. DCFS was approached by Za'Meira's paternal grandparents about placement. Za'Meira was placed there in July 2023, where she remains.

¶ 23　Sisk testified that at the time Za'Meira was placed with the grandparents, she was "aggressive" due to her "significant ADHD" and was attending an alternative school where she could be physically restrained. Za'Meira "was able to correct those behaviors" with the help of her grandparents, who "got her on the right type of medication." The grandparents had also hired a private tutor for Za'Meira. Za'Meira enjoyed swimming, riding a bike, baking, cooking, and going

7

to church. Za'Meira and her grandparents had developed a close and loving bond. Also residing in the home were the teenaged brothers of Jacob E. Sisk testified that they all seem to have developed "a pretty good bond."

¶ 24   Sisk testified that Za'Meira loved Tahshaydia, and they enjoyed spending time together. Sisk also testified that according to a police report, Tahshaydia and her boyfriend were arrested in the early hours of April 28, 2025, following a call about a domestic dispute. Sisk noted that Za'Meira had been in care since March 2022 and opined that Za'Meira "needs permanency."

¶ 25   Tahshaydia testified that she did not appear at the fitness hearing because of confusion regarding the date. She said that she had only domestic-violence services to complete, with only "five, six more weeks" of classes at Dove, and therefore she should be finished with services by the beginning of June 2025. As for her visits with Za'Meira, they usually took place at the park or at McDonald's, depending on Za'Meira's preference. Za'Meira was always happy to see Tahshaydia, and their visits always went well. The two had a strong bond. Tahshaydia testified that she lived alone and felt that she could provide Za'Meira with a stable, loving home, and in fact she, as a single parent, had provided Za'Meira with such a home for the first five years of Za'Meira's life. DCFS had become involved with Tahshaydia and Za'Meira only because of "a misunderstanding of somebody else harassing me." Tahshaydia opined that Za'Meira's best interest would not be served by terminating her parental rights.

¶ 26   After hearing argument, the circuit court noted that proper notice of the fitness hearing had been sent to Tahshaydia, but she failed to appear. The court stated that this case was "heartbreaking" because Tahshaydia and Za'Meira loved one another and had a bond. However, Za'Meira had been in care for close to three years, and she needed stability and permanency. For close to two years, Za'Meira had been with her paternal grandparents, and they had formed a

8

"strong bond." Za'Meira's ADHD-related behavior had improved significantly while residing with the grandparents, who "know how to care for her and keep her active." Meanwhile, the issues that brought Za'Meira into care "still exist." The court found that it was in the best interest of Za'Meira to terminate Tahshaydia's rights. Tahshaydia filed a timely notice of appeal.

¶ 27                                     II. ANALYSIS

¶ 28     On appeal, Tahshaydia disputes both the finding that she was an unfit parent and the finding that the best interest of Za'Meira required termination of her parental rights. She argues that both findings are against the manifest weight of the evidence.

¶ 29     The Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2022)), in conjunction with the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2022)), governs the involuntary termination of parental rights. The Juvenile Court Act mandates a two-stage process that circuit courts must follow when determining whether parental rights should be involuntarily terminated. *In re J.L.*, 236 Ill. 2d 329, 337 (2010). These two stages are the fitness stage and the best-interest stage.

¶ 30     At the first stage of an involuntary-termination process, the State has the burden of proving, by clear and convincing evidence, that the parent is "unfit" under one or more of the grounds set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)). See 705 ILCS 405/2-29(2), (4) (West 2022); *In re C.W.*, 199 Ill. 2d 198, 210 (2002). The State does not need to prove each ground alleged in a termination proceeding; if it proves "even a single alleged ground for unfitness," that is enough for a finding of unfitness. *In re Gwynne P.*, 215 Ill. 2d 340, 349 (2005). "Each case concerning parental unfitness is *sui generis*, unique unto itself." *In re Adoption of Syck*, 138 Ill. 2d 255, 279 (1990).

9

¶ 31    On appeal, the circuit court's determination of parental unfitness is given great deference. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31. That is because such a determination involves factual findings and credibility assessments that the circuit court, by virtue of its superior opportunity to view and evaluate the parties, is in the best position to make. *In re M.I.*, 2016 IL 120232, ¶ 2. A court of review will not reverse a circuit court's finding as to parental unfitness unless that finding is against the manifest weight of the evidence. *In re K.I.*, 2016 IL App (3d) 160010, ¶ 38 (citing *In re Gwynne P.*, 215 Ill. 2d at 354). A decision is against the manifest weight of the evidence only if an opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence. *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16. Hence, if the evidence is sufficient to prove a single ground of unfitness, this court need not consider the other grounds found by the circuit court. *In re Tiffany M.*, 353 Ill. App. 3d 883, 891 (2004); *In re D.D.*, 196 Ill. 2d 405, 422 (2001).

¶ 32    Here, the circuit court found Tahshaydia unfit under three of the grounds set forth in section 1(D) of the Adoption Act. One of those grounds was that Tahshaydia had failed to make reasonable progress toward the return of Za'Meira during the nine-month period from February 28, 2024, to November 28, 2024, under section 1(D)(m)(ii) of the Adoption Act. Section 1(D)(m)(ii) states that a parent is unfit to have a child if the circuit court finds that the parent has failed "to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1(D)(m)(ii) (West 2022). Reasonable progress is an objective standard that focuses on the amount of progress toward the goal of reunification one can reasonably expect under the circumstances. *In re C.M.*, 305 Ill. App. 3d 154, 164 (1999). "Reasonable progress exists when the [circuit] court can conclude that it will

10

be able to order the child returned to parental custody in the near future." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006).

¶ 33   At the fitness hearing on February 27, 2025, Brown testified that the four "primary services" recommended for Tahshaydia were parenting, mental health, domestic violence, and substance abuse. Tahshaydia had completed all of her parenting services, she had been engaged in mental health counseling for 19 months, and Tahshaydia's monthly supervised visits with Za'Meira had improved and were going well. However, Tahshaydia had not made reasonable progress in the areas of substance abuse and domestic violence.

¶ 34   After Tahshaydia's DUI arrest in January 2023, she had completed DUI assessments with two different service providers. However, there was no indication that Tahshaydia had ever engaged in any substance abuse services. Brown had scheduled 24 drug screens for Tahshaydia from September 2024 through January 2025, but Tahshaydia failed to appear for any of them. Brown testified that there was not only a lack of reasonable progress, there was a total lack of effort.

¶ 35   Despite completion of domestic violence services, in the summer of 2024, Tahshaydia was the victim in two incidents of domestic violence, one month apart, and refused to press charges. Tahshaydia had regular telephone contact with her abuser while he was in jail. Brown recommended in August 2024 that Tahshaydia engage again with domestic violence services, but Tahshaydia continually refused throughout the relevant nine-month period. During a supervised visit in September 2024, Tahshaydia had allowed Za'Meira to talk over the phone with Tahshaydia's abuser. This contact was a "major" concern for Brown, because it showed the casualness with which Tahshaydia treated her own abuse, and the volatile environment to which she could have exposed Za'Meira. Brown testified that Tahshaydia was rated "unsatisfactory" in

11

her service plan between March 2024 and December 2024, and DCFS would not be able to return Za'Meira to Tahshaydia in the reasonably near future.

¶ 36 We find that the record overwhelmingly supports the circuit court's finding that there was a lack of reasonable progress by Tahshaydia toward the return of Za'Meira during the relevant nine-month period. Because an opposite conclusion is not clearly apparent, the circuit court's finding of unfitness was not against the manifest weight of the evidence. Since the evidence was sufficient to prove this one ground of unfitness, this court need not consider the other grounds found by the circuit court. See *In re Tiffany M.*, 353 Ill. App. 3d at 891.

¶ 37 Once the circuit court has made a finding of parental unfitness, the involuntary-termination process moves to the best-interest stage. In the best-interest stage of a termination proceeding, the State must prove by a preponderance of the evidence that it is in the best interest of the minor to terminate parental rights. *In re D.T.*, 212 Ill. 2d 347, 366 (2004). Although the parent still has an interest in the best-interest stage, the focus is on the child, and the interests of the parent and the child may differ. *Id.* at 363-64. Once the parent has been found unfit, all considerations, including the parent's rights, yield to the best interest of the child. *Id.* On appeal, a court of review will not disturb a circuit court's finding as to a minor's best interest unless that decision is against the manifest weight of the evidence. *In re N.B.*, 2019 IL App (2d) 180797, ¶ 43.

¶ 38 The circuit court must analyze several factors within "the context of the child's age and developmental needs" when considering if termination of parental rights serves a child's best interest. 705 ILCS 405/1-3(4.05) (West 2022). Those factors include: "(a) the physical safety and welfare of the child, including food, shelter, health, and clothing; (b) the development of the child's identity; (c) the child's background and ties, including familial, cultural, and religious; (d) the child's sense of attachments, including: (i) where the child actually feels love, attachment, and a

12

sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued); (ii) the child's sense of security; (iii) the child's sense of familiarity; (iv) continuity of affection for the child; (v) the least disruptive placement alternative for the child; (e) the child's wishes and long-term goals; (f) the child's community ties, including church, school, and friends; (g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives; (h) the uniqueness of every family and child; (i) the risks attendant to entering and being in substitute care; and (j) the preferences of the persons available to care for the child." *Id.* The trial court is not required to make an explicit finding on each of the best-interest factors. *In re Ca. B.*, 2019 IL App (1st) 181024, ¶ 33 (citing *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19); *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 43 (citing *In re Marriage of Diehl*, 221 Ill. App. 3d 410, 424 (1991)).

¶ 39       During closing arguments, the guardian *ad litem* recited the statutory factors the court must consider when deciding whether to terminate Tahshaydia's parental rights. Immediately thereafter, the court made the following findings:

"All right. Show witnesses sworn, evidence heard, arguments of counsel heard and considered. Proper Notice was sent to [Tahshaydia] for the fitness hearing, and she was not here on that date. I already made my findings as to fitness, and I did find that she was an unfit parent for various reasons. Some of which involves the continued domestic violence in her life. This is a heartbreaking case because Zameira does love her mother. I know [Tahshaydia] loves her daughter, and Zameira's not a young child. They do have a bond, but the facts are that Zameira has been in care close to three years since adjudication. She's been with her paternal

13

grandparents almost two years consistently. She has significant ADHD and medical hist— well, behavioral history, which has decreased since being with these paternal grandparents. She has a strong bond with them. They know how to care for her and keep her active. She's doing well in school now. She's physically safe. It is a biological relationship with this foster family. It sounds like she has a sense of security, familiarity, and most important to me is continuity with this family. This child has been in care for almost three years, and she needs stability and a sense of permanency in her life. This isn't an easy decision because of your bond *** but the work has not been put in, and the issues that brought her into care still exist, so I do find that it's in Zameira's best interest to terminate the rights of [Jacob E.] as well as [Tahshaydia]."

¶ 40    Again, we find that the record overwhelmingly supports the circuit court's finding that it was in Za'Meira's best interest to terminate Tahshaydia's parental rights. Because an opposite conclusion is not clearly apparent, the circuit court's termination finding was not against the manifest weight of the evidence.

¶ 41                                    III. CONCLUSION

¶ 42    For the above reasons, the circuit court's orders finding Tahshaydia unfit and terminating her parental rights are affirmed.


¶ 43    Affirmed.

14